Jerry ALEXANDER, Cipriano Alvarado, Lavonne Anderson, John Bennett, Marty Charles, Howard Childers, Coy Cook, Scott Cook, Michael Cox, Shirley Davis, Edwin Dean, Lois Dentis, Sheri Dillman, Preston Dugan, James Emerson, Jimmy Ford, Kenneth Gaddy, Teresa Gladd, Richard Higgins, Judy Hilker, Danny Jackson, James Keeling, Danny Kelly, Diane Kelly, Dorothea Kidney, William Knight, Barbara Larue, Larry Lee, Michael Marquez, Dale McDaniel, Janie Miller, Gilbert Nail, Darrin Prock, Homer Purcell, Donna Rambo, James Ready, Larry Scarbrough, Alfred Seip, Ray Shivers, Harold Skaggs, Bobby Smith, David Smith, Timothy Snider, Joelle Struble, Victor Taylor, Victoria Vaughn, Steve Wegner, Dean Wise, Clarence Woods, Michael Siler, and Cleotis Raines, Plaintiffs,

v.

SMITH & NEPHEW, P.L.C., and Smith & Nephew Richards, Inc., Defendants.

No. 96–CV–1004–K(E).

United States District Court, N.D. Oklahoma.

May 4, 2000.

See also: 98 F.Supp.2d 1310; 98 F.Supp.2d 1299; 98 F.Supp.2d 1288.

Gary Allen Eaton, Eaton & Sparks, Tulsa, OK, Michael Ross Green, Tulsa, OK, William Earl Sparks, Tulsa, OK, for Plaintiffs.

Richard Mark Eldridge, Thomas E. Steichen, Rhodes Hieronymus Jones Tucker & Gable, Tulsa, OK, James B. Irwin, Sally I. Gaden, Montgomery Barnett Brown Read Hammond & Mintz LLP, New Orleans, LA, for Defendant.

## ORDER

KERN, Chief Judge.

Before the Court are Defendant Smith & Nephew Richards, Inc.'s ("Defendant's") motions for summary judgment and to exclude or limit the testimony of Jerry D. McKenzie, M.D., as to Plaintiff William Knight ("Plaintiff").

### I. History of Case

This is a products liability case concerning the Rogozinski Spinal Rod System manufactured by Defendant, presently on remand from *In re Orthopedic Bone Screw Products Liability Litigation,* multidistrict litigation number 1014, in the United States District Court for the Eastern District of Pennsylvania. Plaintiff is suing Defendant for injuries allegedly sustained due to the Rogozinski system implanted into his back in 1993. Plaintiff's theories for liability include manufacturers' products liability, negligence, negligence per se, failure to warn, breach of express and implied warranties, and fraud.

Plaintiff first injured his back in January 1991, when he slipped and fell in a store. Plaintiff again injured his back by

slipping and falling in September of the same year. Plaintiff sustained a more severe injury in December 1992, when he fell while unloading a truck at work. Following this accident, Plaintiff experienced constant low back pain, worsened by bending, stooping, twisting, and lifting, and tingling paresthesia and numbness into his legs bilaterally, which was more severe on his left side. Plaintiff underwent rehabilitation therapy, during which time he also experienced problems with his bladder and sleeplessness. In June 1993, Dr. Hawkins found Mr. Knight to be suffering from a decrease in disc space and height at L5–S1; degenerative changes and desiccation of both L4–5 and L5–S1 discs; bulging centrally of the L4 disc; and possible herniation at L5–S1, primarily central. Following a year of conservative treatment and an episode of severe muscle spasms and pain, Mr. Knight expressed a wish to have surgery. Dr. Hawkins discussed the risks, benefits, and possible complications of this surgery with Mr. Knight and his wife. On January 31, 1994, Dr. Hawkins performed a decompressive lumbar laminectomy with medial facetectomies; foraminotomies at L4–5 and L5–S1; discectomy at L5–S1; open reduction and segmental fixation of the L4–5 and L5–S1 levels using the Rogozinski Spinal Rod System; bilateral lateral mass fusion of L4–5 and L5–S1; excision of spinous processes at L4 and L5; and harvest and use of left corticocancellous iliac bone graft for the fusion mass. Dr. Hawkins also prescribed a bone growth stimulator. Although Mr. Knight had a small accident less than a month following surgery, an x-ray showed anatomic alignment, no fracture deformities, and intact hardware. Although Plaintiff's fusion was slow to ossify, he experienced decreased pain and x-rays showed excellent fixation and alignment and eventually apparently solid fusion. Mr. Knight, however, continued to have pain and he eventually chose to have the Rogozinski device removed. On February 8, 1995, Dr. Hawkins performed a removal of bone and bursa around the edges of the implant, screws, and couplers at L4–5 and S1 bilaterally; removal of the Rogozinski device from L4–5 and S1; and decompression of lumbar and redo laminectomy at L4–5 and S1 left. Dr. Hawkins further explored the lateral fusion at L4–5 and S1 and found it to be solid. Plaintiff argues that the Rogozinski system was not mechanically strong enough to support his spine during the fusion process, did not promote fusion or provide any medical benefit, and that it aggravated, if not caused, his medical problems, primarily continued back and leg pain, sexual and bladder dysfunction, and anxiety and depression.

## II. Exclusion of Expert Testimony

Defendant seeks to exclude the testimony of Dr. Jerry D. McKenzie, Plaintiff's medical causation expert, for failure to satisfy Fed.R.Evid. 702. Defendant argues that Dr. McKenzie is not qualified to testify as to his expressed opinions, his opinions are not sufficiently reliable to satisfy Rule 702, and his opinions are irrelevant to the case.

### A. Standard

Fed.R.Evid. 702 authorizes a "witness qualified as an expert by knowledge, skill, experience, training, or education" to testify as to "scientific, technical, or other specialized knowledge." Testimony is admissible under Fed.R.Evid. 702, if it "rests on a reliable foundation and is relevant." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In making its initial determination of reliability, the Court has broad latitude to consider whatever factors the Court finds useful, and the particular factors will depend on the unique circumstances of the expert testimony involved. *See id.* at 152, 119 S.Ct. 1167. Factors mentioned in *Daubert* and *Kumho* include the following: (1) whether the reasoning or methodology underlying the expert's opinion has been or could be tested; (2) whether the reasoning or meth-

odology has been subject to peer review and publication; (3) the known or potential rate of error; and (4) the level of acceptance of the reasoning or methodology by the relevant professional community. *See id.* at 149–52, 119 S.Ct. 1167; *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). These factors are not necessarily applied in every case and are not exclusive of other factors. *See Kumho,* 526 U.S. at 150, 119 S.Ct. 1167. An expert may rely on facts and data not in evidence to the extent reasonably relied upon by experts in his field. *See* Fed.R.Evid. 703. Rule 702 was intended to liberalize the introduction of relevant expert evidence and such testimony is subject to being tested by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. The Court also must recognize that expert witnesses have the potential to "be both powerful and quite misleading." *Id.* at 595, 113 S.Ct. 2786.

### B. Dr. McKenzie's Qualifications

■ Dr. McKenzie does not qualify as an expert to testify as to the causation of Plaintiff's ailments. Dr. McKenzie's report indicates that he proposes to testify that (1) the Rogozinski device did not provide any medical advantage to Mr. Knight; (2) he developed a localized chronic inflammatory response from the device that caused fibrous reactive scar tissue and foraminal stenosis; (3) this reaction resulted in nerve root adhesions and chronic severe lumbar pain with radiating pain into both lower extremities, loss of sensation in the buttocks and lower extremities, difficulty walking, loss of motion in the lower back, and chronic pain, which further caused anxiety and depression; (4) the destruction of the normal architectural structure of the lumbar spine in order to insert the device resulted in the increased debility and instability of Mr. Knight's lumbar spine; and (5) an examination of the Rogozinski device explanted from Plaintiff indicates corrosion and abrasion.

The simple possession of a medical degree is insufficient to qualify a physician to testify as to the advantages of an spinal fixation device, the medical causation of spine-related ailments, or the mechanical functioning of an orthopedic implantation device. Plaintiff cites to *Wheeler v. John Deere Co.,* which states that "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." 935 F.2d 1090, 1100 (10th Cir.1991). This opinion and the other federal cases cited by Plaintiff, however, are pre-*Daubert.*[1] A blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities.[2]

Dr. McKenzie's qualifications even fail to satisfy the Fifth Circuit's quite liberal qualification test. That Circuit finds that, while a completely unqualified expert should not testify, *Daubert* focuses instead on relevancy and reliability. *See Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 (5th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000). Therefore, "[a]s long as some reasonable indication of qualifications is ad-

---

**1.** In fact, the only post-*Daubert* Tenth Circuit opinion to cite *Wheeler* is *Compton v. Subaru of America, Inc.,* 82 F.3d 1513, 1519 (10th Cir.1996). *Compton,* however, was based on the erroneous holding that *Daubert* was inapplicable to opinions not based on a particular methodology or technique. *See id., abrogated by Kumho,* 119 S.Ct. at 1170.

**2.** Other courts have reached a similar conclusion regarding the testimony of medical doctors. *See, e.g., Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 24 (D.Mass.1995) ("Just as a lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease.").

duced, the court may admit the evidence without abdicating its gate-keeping function." *Id.* As more fully set out below, Dr. McKenzie's qualifications fail to satisfy even this minimal test.

Dr. McKenzie's experience as an emergency room physician and in legal medicine for workers' compensation injuries does not qualify him to give the opinions to which he proposes to testify. Dr. McKenzie has been licensed as a doctor in Oklahoma since 1967, with over two decades of experience in emergency medicine. Dr. McKenzie is not board certified in any medical specialty and has no experience or training in orthopedics, spinal surgery, spinal fusion with instrumentation, neurology, or other areas remotely related to the subject of his opinions. Plaintiff makes no attempt to demonstrate Dr. McKenzie's qualifications in these specialized area but rather relies on his assertion that Dr. McKenzie's medical degree is qualification enough. Plaintiff simply has not demonstrated that Dr. McKenzie is "qualified as an expert by knowledge, skill, experience, training, or education" to testify as to the effects of the Rogozinski device or the causes of Mr. Knight's ailments.[3] *See* Fed.R.Civ.Evid. 702.

### C. Reliable Foundation

 Even if Dr. McKenzie possessed the appropriate qualifications, his proffer lacks a reliable foundation. Plaintiff must show that Dr. McKenzie's method is scientifically sound and his opinion is based on sufficiently reliable facts. *See Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir. 1999). At a minimum, Dr. McKenzie should describe the method he used in

reaching, and the data supporting, his determination. The Court cannot rely on an expert's mere assurance that the methodology and data are reliable. *See id.* The Court does not focus on an expert's conclusions but on whether his principles and methodology are sound. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. If any step renders Dr. McKenzie's opinion unreliable—either in the choice of methodology or its application—his opinion is inadmissible. *See Mitchell,* 165 F.3d at 782.

Dr. McKenzie's methodology for determining the medical causation of Plaintiff's ailments is wholly lacking in reliability.[4] Dr. McKenzie notes that he interviewed Mr. Knight, reviewed certain medical records and prior x-ray reports, inspected Mr. Knight's explanted device, and performed a physical examination of Mr. Knight. On this basis and his expertise as a licensed physician, Dr. McKenzie opines that the Rogozinski device caused the numerous problems listed above. Dr. McKenzie, however, fails to explain why he eliminated, assuming he even considered, other possible causes for Plaintiff's injuries. Dr. McKenzie does not explain when Mr. Knight's sexual difficulties began, although Mr. Knight has testified that his problems started after his injury and before the implant surgery. Dr. McKenzie also fails to consider, much less mention, Plaintiff's prior history of depression as far back of 1987. Dr. McKenzie's opinion is devoid of any indice of reliable methodology or any indication of any methodology whatsoever, other than examining the patient and attributing all of his physical and psychological problems, whether preexistent or not, to the Rogozinski device.[5]

3. Dr. McKenzie's qualifications to render opinions regarding the mechanical behavior of the Rogozinski device while implanted are even more lacking. Dr. McKenzie has demonstrated absolutely no training, education, or experience in biomechanics or any related field.

4. This discussion will focus on Dr. McKenzie's evaluation of whether Defendant's device *actually* caused Plaintiff's injuries, specific

causation, rather than whether it is *capable* of causing such injuries, general causation. The parties do not appear to dispute the issue of general causation for the purposes of the motion to exclude.

5. Other courts have found that some sort of differential diagnosis or attempted elimination of other causes is an important, if not necessary, factor in determining the reliability of a medical causation opinion. *See, e.g.,*

The standard used to determine the sufficiency of causation evidence does not affect this analysis. Plaintiff's reliance on the lesser causation standard of *McKellips v. Saint Francis Hospital, Inc.*, in order to cure the defects in his expert's methodology, is misplaced. 741 P.2d 467 (Okla.1987). In *McKellips*, the Oklahoma Supreme Court adopted the loss of chance of survival doctrine that lessens the causation burden in medical malpractice cases where the duty breached was one imposed to prevent the type of harm the patient ultimately sustained. *See id.* at 474. This doctrine, even if it were otherwise applicable, has *not* been extended to ordinary negligence actions brought against persons other than a medical practitioner or hospital. *See Hardy v. Southwestern Bell Tel. Co.*, 910 P.2d 1024, 1025–26 (Okla.1996). Thus, even if a lesser causation standard would be sufficient to lessen the reliability standards imposed by *Daubert*, the doctrine is inapplicable to this case. Furthermore, requiring Dr. McKenzie to employ differential diagnosis does not require Plaintiff to prove causation beyond a reasonable doubt. Contrary to Plaintiff's analysis, *In re Paoli Railroad Yard PCB Litigation* reemphasizes the need for a medical causation expert to engage in diagnostic techniques that rule out other causes and offer a good explanation as to why his conclusion remains reliable when he does not. 35 F.3d 717, 761 (3d Cir.1994). Dr. McKenzie has failed to do so and does not meet the reliability requirements imposed by Rule 702.[6]

> *Rutigliano v. Valley Bus. Forms*, 929 F.Supp. 779, 786 (D.N.J.1996) (requiring differential diagnosis before an expert may give opinion testimony regarding specific causation), *aff'd*, 118 F.3d 1577 (3d Cir.1997); *Wooley v. Smith & Nephew Richards, Inc.*, 67 F.Supp.2d 703, 703 (S.D.Tex.1999) (rejecting expert opinion as unreliable that, among other things, lacked any analysis indicating how other possible causes of the patient's pain were ruled out); *McCollin v. Synthes Inc.*, 50 F.Supp.2d 1119, 1127 (D.Utah 1999) (rejecting expert's opinion that, among other things, failed to explain how other potential causes were ruled out); *Cali v. Danek Med., Inc.*, 24 F.Supp.2d 941, 951 (W.D.Wis.1998) (finding that expert's as-

## III. Summary Judgment

### A. Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence that would require submission of the case to a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir.1992). Where the nonmoving party will bear the burden of proof at trial, that party must go beyond the pleadings and identify specific facts which demonstrate the existence of an issue to be tried by the jury. *See Mares*, 971 F.2d at 494. Additionally, although the non-moving party need not produce evidence at the summary judgment stage in a form that is admissible at trial, the content or substance of such evidence must be admissible. *See Thomas v. International Bus. Machs.*, 48 F.3d 478, 485 (10th Cir.1995).

### B. Plaintiff's Claims

Plaintiff's claims against Defendant are as follows: (1) manufacturers' products liability; (2) negligence, including negligence per se; (3) failure to warn; (4) breach of

> sertion that implanted device caused patient's symptoms based on his general expertise and without ruling out other possible causes lacked sufficient reliability and was unsupported speculation); *Tucker v. Nike, Inc.*, 919 F.Supp. 1192, 1196–97 (N.D.Ind.1995) (finding that expert's failure to exclude other possible factors and to inquire as to patient's prior injuries rendered opinion unreliable).

**6.** Having found Dr. McKenzie unqualified and his methodology unreliable, the Court does not rule on the relevance of his proffered opinion.

express and implied warranties; and (5) fraud.[7] Defendant argues that, because Plaintiff has failed to prove causation, his entire case should be dismissed. Defendant also argues that Plaintiff's Food and Drug Administration ("FDA") regulatory theories are legally unsound and that Plaintiff cannot establish any defect in the Rogozinski device.

### C. Manufacturers' Products Liability

Because Plaintiff has put forward no evidence of medical causation, Plaintiff's manufacturers' products liability claim must fail. The three elements of a manufacturers' products liability action are as follows: (1) the product caused Plaintiff's injury; (2) the defect existed in the product at the time it left Defendant's possession and control; and (3) the defect rendered the product unreasonably dangerous. *See Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okla.1974). To establish causation, Plaintiff must prove that his injury was caused, not necessarily by the negligence of Defendant, but by reason of a defect built in and existing at the time of his injury. *See id.* at 1364. Unreasonably dangerous means that the device was dangerous to an extent beyond that which would be contemplated by the ordinary customer who purchases it, with the ordinary knowledge common to the community as to its characteristics. *See id.* at 1362–63.

Absent the now-excluded testimony of Dr. McKenzie, Plaintiff has no evidence of medical causation. The Oklahoma Supreme Court has frequently found expert testimony necessary to establish medical causation "[w]here injuries are of a character requiring skilled and professional men to determine the cause and extent thereof." *Williams v. Safeway Stores, Inc.*, 515 P.2d 223, 227 (Okla.1973). Plaintiff has no expert qualified to render an opinion as to the cause of his injuries. As noted above, Dr. McKenzie's testimony cannot be admitted, because he lacks the necessary qualifications and his methodology is unreliable. Plaintiff also attempts to rely on the testimony of Harold Alexander, Ph.D., to satisfy this burden. However, Dr. Alexander's testimony is limited to orthopedic bioengineering by Pretrial Order No. 725.[8] *In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL 1014, 1997 WL 39583 *6 (E.D.Pa. Jan. 23, 1997). This means Dr. Alexander may testify as to "how pedicle screws function in the human body and how the human body functionally, but not medically, responds to pedicle screws." *Id.* at *3. He is not, however, "particularly qualified to make ... statements in the additional disciplines of law, medicine, orthopedics, FDA regulatory practice, conflicts of interest, market surveys, and clinical studies." *Id.* at *4. While Dr. Alexander's affidavit covers many of these disallowed areas, his orthopedic bioengineering testimony is insufficient to create an issue of causation.[9]

---

**7.** This formulation differs somewhat from that found in Plaintiff's complaint. However, given the complex history of the case, the Court will rely on Plaintiff's representations in his summary judgment response as to the extent of his claims.

**8.** Bioengineering includes the following: (1) biomechanics, the study of how a medical device will mechanically interact with surrounding tissue; (2) biomaterials, the study of the materials in a medical device and the body tissue's response to this device; (3) biomedical engineering, the study of how a device should be designed and constructed; and (4) design and analysis of device research, the study of the proper design and

implementation of studies to determine potential risks and benefits associated with device designs and the extent to which those risks and benefits are realized in clinical practice. *See* 1997 WL 39583, at *1, 6.

**9.** Plaintiff argues that Dr. Alexander's testimony is sufficient to establish that the device provided no medical benefit to Plaintiff and generated metal particles and corrosion products that produced an inevitable inflammatory response in adjacent tissues. As noted above, Dr. Alexander may be qualified to testify as to how the body mechanically reacted to the Rogozinski System, but he cannot testify as to how the body *medically* reacted to the device or the medical benefits of the device's

### D. Negligence and Negligence Per Se

#### 1. Negligence

 Plaintiff's negligence claim similarly fails on his inability to show causation. The elements of a negligence claim in Oklahoma are as follows: (1) the existence of a duty owed by Defendant to Plaintiff to use ordinary care; (2) the breach of that duty; and (3) an injury proximately caused by the breach. *See Comer v. Preferred Risk Mut. Ins. Co.*, 991 P.2d 1006, 1010 (Okla.1999). Therefore, in order for Plaintiff to recover on a negligence action, there must be a causal connection between Defendant's actions and the injury. *See Key v. Liquid Energy Corp.*, 906 F.2d 500, 505 (10th Cir.1990). As noted above, Plaintiff has failed to put forth any evidence of causation, rendering judgment for Defendant appropriate as to this claim, as well.

#### 2. Negligence Per Se

 Plaintiff's negligence per se claim fails, because this theory is inapplicable to labeling and marketing violations under the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, and Plaintiff has put forward no evidence of causation. When a statute or regulation governs conduct, the Court may adopt it as the standard required of a reasonably prudent person if the Court believes it appropriate for civil liability. *See Gaines–Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 622 (10th Cir.1998). The violation of a statute is negligence per se if (1) the claimed injury is caused by the law's violation; (2) the injury is of the type intended to.be prevented by the statute; and (3) the injured person is a member of the class the statute intends to protect. *See Lockhart v. Loosen*, 943 P.2d 1074, 1078 (Okla. 1997). Plaintiff's negligence per se claim appears to be based on Defendant's alleged violations of FDA regulations. The Court has rejected this theory in *Johnson v. Smith & Nephew Richards, Inc.*, No. 97–CV–363–K, 1999 WL 1117105 *2 (N.D.Okla. Sept. 30, 1999).

In this case, Plaintiff has failed to put forth evidence that Defendant's alleged violation of the FDA regulations caused his injury. On the contrary, Defendant has submitted Dr. Hawkins' uncontroverted testimony that he knew that the Rogozinski device had not been approved by the FDA to be marketed for the insertion of bone screws in the vertebral pedicles and that he relied on his knowledge of the medical standard of care and the facts of Mr. Knight's case in recommending the surgery.

Furthermore, the regulations alleged to have been violated are administrative and do not impose a standard of care, as could form the basis of a negligence per se claim. Plaintiff argues that Defendant unlawfully marketed the Rogozinski device for use with pedicular attachment. Under the Medical Device Amendments of 1976, 21 U.S.C. §§ 360c *et seq.*, devices are divided into three categories, Classes I, II, and III. The classes range from least to most dangerous. Class I devices are subject only to general controls. *See* 21 U.S.C. § 360c(a)(1)(A). Class II devices are subject to further special controls, and Class III ˙ devices require premarket approval ("PMA"). *See id.* § 360c(a)(1)(B)–(C). At the time of Plaintiff's surgery, the Rogozinski device with pedicular attachment fell under Class III. However, because it was substantially equivalent to devices marketed in interstate commerce prior to May 28, 1976, it could be introduced into the market without PMA. *See id.* §§ 360(k), 360c(f). This equivalency classification applied only to devices labeled and intended to be fixed to the spine by laminar hooks

use. Plaintiff attempts to make an unsupported leap from the device's mechanical behavior to the lack of any "medical benefit" and Plaintiff's symptoms. Plaintiff must bridge this gap with reliable and relevant expert medical causation testimony. While absolute certainty is not required in Oklahoma, the "mere possibility of causation is insufficient." *Hardy v. Southwestern Bell Tel. Co.*, 910 P.2d 1024, 1027 (Okla.1996).

and sacral/iliac attachment. The FDA prohibited Defendant from labeling or promoting the device for pedicular attachment to the vertebral column. Moreover, the FDA required that all labeling prominently note that the screws were intended for sacral/iliac attachment only and include the following statement: "WARNING—THIS DEVICE *IS NOT INTENDED FOR PEDICULAR APPLICATION.*" While the FDA regulates the manner in which Defendant markets the Rogozinski device, it does not regulate a physician's decision to use the device for another, "off-label" use. *See* Citizen Petition Regarding the Food and Drug Administration's Policy on Promotion of Unapproved Uses of Approved Drugs and Devices; Request for Comments, 59 Fed.Reg. 59,820, 59,821 (1994). Furthermore, the parties acknowledge that the FDCA does not provide a private right of action. *See* 21 U.S.C. § 337(a). Nevertheless, Plaintiff seeks to enforce the FDCA by arguing that the FDA's labeling requirements constitute a minimum standard of care. As noted in *Johnson,* these requirements are merely administrative in nature and lack any independent substantive content. *See* 1999 WL 1117105, at *2. Under these circumstances, the Court finds that the alleged violations of FDA regulations do not create a cause of action for negligence per se in Oklahoma. *Cf. Talley v. Danek Med., Inc.,* 179 F.3d 154, 161 (4th Cir.1999) (finding no negligence per se claim under Virginia law, because the regulations lack substantive content); *Baker v. Danek Med.,* 35 F.Supp.2d 875, 878 (N.D.Fla.1998) (finding no negligence per se claim under Florida law where FDCA does not provide private right of action and FDA status was immaterial to implanting surgeon); *but cf. Valente v. Sofamor,* 48 F.Supp.2d 862, 876 (E.D.Wis.1999) (disagreeing with *Cali v. Danek Med., Inc.,* 24 F.Supp.2d 941, 954 (W.D.Wis.1998), and finding Wisconsin law

allows negligence per se claim based on violation of FDCA).

### E. Failure to Warn

 Plaintiff's failure to warn claim fails under the learned intermediary doctrine. In Oklahoma, the learned intermediary doctrine is an exception to the duty to warn, under which the manufacturer can warn the physician rather than the ultimate consumer.[10] *See Tansy v. Dacomed Corp.,* 890 P.2d 881, 886 (Okla. 1994). The reasoning behind this doctrine is instructive. As a physician, Dr. Hawkins has the duty to inform himself of the qualities and characteristics of the Rogozinski system and to exercise independent judgment, taking into account his knowledge of the patient, as well as the product. *See Edwards v. Basel Pharms.,* 933 P.2d 298, 300 (Okla.1997). The patient is expected to rely primarily on this judgment. *See id.* Therefore, if the Defendant properly informed Dr. Hawkins, it is entitled to assume that he exercised his informed judgment. *See id.* at 300–01. In this case, Dr. Hawkins has testified that he was fully informed as to the FDA status of the Rogozinski System, knew of its risks, did not rely on Defendant's promotional materials, and exercised his independent medical judgment based on the standards of care and Mr. Knight's situation in recommending the surgery. Plaintiff has presented no evidence to the contrary. Given these uncontroverted facts, Plaintiff can show no injury resulting from any failure to warn Dr. Hawkins.

### F. Breach of Express and Implied Warranties

 Plaintiff's claim for breach of express warranty fails, because Plaintiff has submitted no evidence that Dr. Hawkins relied on any of Defendant's representations. *See Speed Fastners, Inc. v. New-*

---

**10.** There are two exceptions to the learned intermediary doctrine in Oklahoma—mass immunizations and situations where the FDA has mandated that warning be given directly

to the consumer—neither of which is applicable here. *See Edwards v. Basel Pharms.,* 933 P.2d 298, 301 (Okla.1997).

*som,* 382 F.2d 395, 397 (10th Cir.1967). Dr. Hawkins states in his affidavit that Defendant did not make any warranty about, or promise of performance concerning, the Rogozinski System and that he was knowledgeable of the device's regulatory status and risks. He also states that he has used different spinal fixation devices and based his decision to use the Rogozinski device on his experience with the system. Plaintiff's only response is that the Court can infer that Dr. Hawkins relied on these representations despite his affidavit to the contrary. Plaintiff puts forward no material facts in support of Dr. Hawkins' reliance, warranting summary judgment to Defendant on this claim.

Plaintiff's warranty claims also lack any evidence of causation. In addition to breach of express warranty, Plaintiff alleges breach of implied warranty of fitness for intended use. In a products liability action, breach of implied warranty is no longer an appropriate remedy except as provided in the Uniform Commercial Code. *See Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1365 (Okla.1974). In order to recover for breach of warranty, Plaintiff must show the following: (1) the existence of the warranty; (2) that the warranty was broken; and (3) that the breach was the proximate cause of the loss sustained. *See American Fertilizer Specialists, Inc. v. Wood,* 635 P.2d 592, 595 (Okla.1981); *see also* U.C.C. § 2–314 cmt. 13. As noted above, Plaintiff has no evidence that the device caused his injuries.

### G. Fraud

A fraud claim requires Plaintiff to prove (1) Defendant made a material representation; (2) that was false; (3) and made knowingly or recklessly, without regard for its truth; (4) with the intent that it be acted upon; and (5) Plaintiff was injured as a result. *See McCain v. Combined Communications Corp. of Okla., Inc.,* 975 P.2d 865, 867 (Okla.1998). In order to succeed on this claim, Plaintiff must show that Defendant's submissions to the FDA caused Dr. Hawkins to use the Rogozinski Spinal System and that the device caused his injury. As detailed above, Plaintiff has no evidence supporting either assertion.

### IV. Conclusion

Because Dr. McKenzie is not qualified to render his proffered expert opinion and because his methodology is unreliable, his testimony is excluded. Absent this testimony, Plaintiff lacks any evidence that the Rogozinski Spinal Rod System caused his injuries. Plaintiff also has submitted no evidence to contradict Defendant's evidence that his surgeon, Dr. Hawkins, was aware of the FDA status of the device, did not rely on any representations made by Defendant, was aware of its risks, and chose to implant the Rogozinski system in Mr. Knight based on his independent medical knowledge. Under these circumstances, Plaintiff's claims for manufacturers' products liability, negligence, negligence per se, failure to warn, breach of express and implied warranties, and fraud must fail.

IT IS THEREFORE ORDERED that Defendant's Motion to Exclude, or in the Alternative, Limit the Testimony of Jerry D. McKenzie, M.D. as to Plaintiff William Knight (# 11) is GRANTED and Defendant's Motion for Summary Judgment as to Plaintiff, William Knight (# 10) is GRANTED.