# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### September 18, 2012 Session

## JESSICA ABEYTA v. HCA HEALTH SERVICES OF TN, INC. d/b/a PARTHENON PAVILLION

### Direct Appeal from the Circuit Court for Davidson County
### No. 09C3286      Hamilton V. Gayden, Jr., Judge

---

### No. M2011-02254-COA-R3-CV - Filed October 24, 2012

---

This is an involuntary commitment case, in which we are asked to review the trial court's grant of Appellee/Hospital's motion to dismiss. The trial court found that all of the claims asserted in Appellant/Patient's complaint sounded in medical malpractice. Because Appellant failed to provide a certificate of good faith as required under the Tennessee Medical Malpractice Act, Tennessee Code Annotated Section 29-26-115, *et seq*. ("TMMA"), the trial court granted Appellee's motion to dismiss. Appellant argues that not all of her stated claims sound in medical malpractice. We affirm the dismissal of Appellant's claim asserting a violation of the Americans with Disabilities Act. However, we conclude that Appellant has stated a claim for medical battery, as well as a claim for negligence per se arising from alleged violations of the involuntary commitment statutes. Moreover, because Appellant's negligence per se claims survive the motion to dismiss, she may also maintain the false imprisonment and invasion of privacy claims. Affirmed in part, reversed in part, and remanded.

### Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Jessica Abeyta, Nashville, Tennessee, Pro Se.

Dixie W. Cooper, James C. Sperring, and Brian D. Cummings, Nashville, Tennessee, for the appellee, Parthenon Pavilion of Centennial Medical Center.

### OPINION

On September 18, 2009, Appellant Jessica Abeyta filed a complaint against Appellee Parthenon Pavilion of Centennial Medical Center ("Parthenon") in the Circuit Court at Davidson County.[1]  The September 18, 2009 complaint also listed Dr. Cynthia Janes as a party-defendant; however, Dr. Janes was dismissed from the case by order of October 26, 2010.[2]  On February 19, 2010, Parthenon filed a motion to dismiss on grounds that: (1) the Appellant's claims were medical malpractice claims and were, thereby governed by the TMMA; (2) Appellant failed to provide pre-suit notice to Parthenon Pavilion, as required under Tennessee Code Annotated Section 29-26-121; and (3) Appellant failed to file a certificate of good faith, as required under Tennessee Code Annotated Section 29-26-122.

On March 10, 2010, the trial court entered an order: (1) finding that Appellant's claims constituted medical malpractice claims; (2) excusing the Appellant's failure to comply with Tennessee Code Annotated Section 29-16-121 (i.e., the notice requirement); and (3) allowing the Appellant an extension of time, until April 5, 2010, to file a certificate of good faith.  Ms. Abeyta did not file a certificate of good faith; rather, on April 4, 2010, she filed a motion for permission to file an interlocutory appeal of the trial court's March 10, 2010 order.  The motion for interlocutory appeal was denied by order of April 14, 2010.

On May 14, 2010, the trial court entered an order dismissing the Appellant's medical malpractice claims for failure to file a certificate of good faith.  However, the court found that the complaint arguably included claims that fell outside of what would be considered medical malpractice claims; accordingly, the trial court ordered Ms. Abeyta to file an amended complaint, setting out her claims with greater specificity.  Ms. Abeyta filed her amended complaint on the same day, i.e., May 14, 2010.

On November 12, 2010, Ms. Abeyta's attorney was granted permission to withdraw; from that point, Ms. Abeyta has proceeded *pro se* in this case.  On May 19, 2011, Parthenon filed a motion to dismiss the amended complaint, arguing that all claims therein sounded in medical malpractice and that the complaint should be dismissed because of Ms. Abeyta's

---

[1] We note that the case was originally filed on June 11, 2008 in the United States District Court for the Middle District of Tennessee.  On September 18, 2008, the District Court entered an order, finding that a frivolity hearing was necessary.  Before that hearing could take place, on November 24, 2008, Ms. Abeyta filed a motion for voluntary dismissal without prejudice.  This motion was granted on December 2, 2008 and the case was subsequently re-filed in the Circuit Court as noted.

[2] Specifically, Dr. Janes filed a motion to dismiss on September 13, 2010, arguing that Ms. Abeyta had failed to comply with the TMMA by not filing a certificate of good faith.  Ms. Abeyta countered that not all of her claims sounded in medical malpractice. Upon review, the trial court agreed with Dr. Janes and entered an order dismissing the case against her.  Appellant has not appealed Dr. Janes' dismissal.

alleged failure to provide a certificate of good faith as required under Tennessee Code Annotated Section 29-26-122. After several delays, the motion to dismiss was heard on July 8, 2011. On September 16, 2011, the trial court entered an order granting Parthenon's motion to dismiss the complaint in its entirety with prejudice. In granting the motion, the court specifically found that: (1) even assuming that the factual allegations asserted in the complaint are true, each of the causes of action "involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons;" (2) as such, Ms. Abeyta's claims sound in medical malpractice and not in ordinary negligence; (3) Ms. Abeyta had failed to comply with the requirements of Tennessee Code Annotated Section 29-26-122 of the TMMA by failing to file a certificate of good faith; and (4) Ms. Abeyta had been given proper notice and had been afforded due process.

Ms. Abeyta filed a timely notice of appeal. The sole issue presented for review is:

> Whether the trial court erred in granting Parthenon's motion to dismiss on the grounds that all of Ms. Abeyta's claims sounded in legal malpractice and that she had failed to comply with the certificate of good faith requirement under the TMMA?

We first note that, while we are cognizant of the fact that Ms. Abeyta is proceeding *pro se* in this appeal, it is well settled that *pro se* litigants are held to the same procedural and substantive standards to which lawyers must adhere. As recently explained by this Court:

> Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. The courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary. Thus, the courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe.

*Jackson v. Lanphere*, No. M2010–01401–COA–R3–CV, 2011 WL 3566978, at \*3 (Tenn. Ct. App. Aug. 12, 2011) (quoting *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003)).

This case was adjudicated upon the grant of Parthenon's motion to dismiss. It is well settled that a motion to dismiss tests the legal sufficiency of the complaint itself. *Cook v. Spinnakers of Rivergate, Inc.,* 878 S.W.2d 934, 938 (Tenn.1994). The ground for such a

motion is that the allegations of the complaint, if considered true, are not sufficient to constitute a cause of action as a matter of law. *Id.* A motion to dismiss should be granted only if it appears that the plaintiff cannot establish any facts in support of the claim that would warrant relief. *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn.1999). We review a trial court's award of a motion to dismiss *de novo*, with no presumption of correctness. *Stein v. Davidson Hotel Co.*, 945 S.W .2d 714, 716 (Tenn.1997).

Because a motion to dismiss tests the legal sufficiency of the complaint alone, we begin with a review of the relevant facts contained in the amended complaint. Therein, Ms. Abeyta states that this case arose from an incident that occurred on June 11, 2007, while she was at her mother's home. Ms. Abeyta's complaint states that, on that day, there was a gas leak at the home. As a result of the gas leak, Ms. Abeyta avers that she suffered an asthma attack. Her mother, who was allegedly very confused, called the Davidson County Mobile Crisis Response Team, which arrived at the home shortly thereafter. When the crisis team arrived, Ms. Abeyta states that she was unable to communicate due to her asthma and the confusing circumstances. She was allegedly placed into a police car by the crisis team, where she was prohibited from calling anyone for help. She was then taken to Parthenon. We note that the crisis team and its members are not listed as party-defendants in this case. Rather, we are concerned only with the allegations made against Parthenon, or its staff, in this case.[3] Those factual allegations are set out in the amended complaint as follows:

> 13.   After inquiry from employees of [Parthenon], Plaintiff explained that she suffers from seizures and also explained her other health conditions. She also explained that she felt weak. Her explanations and health history were recorded simply that the patient had reported a history of seizures.
>
> *                        *                        *
>
> 15.   The emergency room doctor was able to see that Plaintiff's body was in distress. He performed some baseline tests, thus only being able  to see that moment in time and with the influence of surrounding doubts.  This doctor noted any abnormalities.
>
> 16.   Emergency room doctor and intake wrote in the medical chart that the Plaintiff suffers from delusions about her medical

---

[3] In the first cause of action set out in the amended complaint, Ms. Abeyta asserts that Parthenon is vicariously liable for the acts and omissions of its employees.

-4-

conditions. This resulted from the unproven comments that were communicated by the strangers who were on the mobile crisis team. . . .

17. Plaintiff was not able to contact anyone for help as Parthenon Pavilion and its staff closed her within its confinements.

18. At Parthenon Pavilion, Plaintiff was forced to wait without food or water. She was also prohibited from contacting any support and aid for some time.

19. Under these circumstances, Plaintiff bore a considerable burden to assert the truth of her health conditions. She tried to explain this to members of Parthenon Pavilion. Plaintiff was concerned about the system and procedures of rushing people through. She was also cognizant of the fact that no one would take the time to believe her.

*                              *                              *

21. While waiting at Parthenon Pavilion, there were never any actions taken by Parthenon Pavilion, or its staff, to confirm the reality of her health condition under such straining influences. Also, Plaintiff was never provided the opportunity to prove that she did in fact suffer from the effects of her asthma.

*                              *                              *

23. While at Parthenon Pavilion, Plaintiff was asked a series of questions through different admitting persons at a fast rate. Some of these questions concerned whether Plaintiff wanted to hurt herself or anyone else, or, if she heard voices.

24. Plaintiff tried answering the questions truthfully and was not violent or acting as a threat to herself or others. Plaintiff spoke in hopes that her communications would help someone realize the invasions to her privacy and personal space.

25. Plaintiff was then forced to go into a padded room. Her

-5-

clothes were taken off of her against her will so she could be screened. This was done near a group of individuals where a male individual could see her being undressed.

26. Plaintiff had previously requested the opportunity to rest and explained that she was feeling dizzy, yet she was prohibited the opportunity to rest. Because she was repeatedly being seen and questioned by employees of Parthenon Pavilion, she could not take deep breaths or rest.

\*                          \*                          \*

29. On the evening of June 11, 2007, and thus before a probable cause hearing was conducted, the Plaintiff was prescribed Haldol, Depakote and Abilify.

30. Plaintiff was forcibly restrained and was administered the above-referenced, including the psychotropic drug, despite stating to the staff of Parthenon Pavilion that she was ready and willing to go to sleep in peace.

31. All of these drugs have warnings of dangerous risks for those with certain medical conditions. Haldol, in particular, is a strong anti-psychotic drug, which causes adverse reactions to anyone who suffers from seizure disorders.

32. This drug was contraindicated to her prior health issues. The drug sped up her heart rhythms to a degree of pain.

\*                          \*                          \*

38. Plaintiff's medical record shows the initiation of drugs to be enforced by the staff of Parthenon Pavilion. . . . The Plaintiff did not display or state any suicidal or homicidal ideation at any time prior to, or while being held at Parthenon Pavilion.

\*                          \*                          \*

44. Plaintiff states that interruptions to her rest and privacy

occurred almost every hour by individuals entering her room without her consent.

45. Plaintiff was not allowed to take baths by herself.

\*                                    \*                                    \*

48. The effects of the drugs forcibly administered by the Defendants affected Plaintiff's ability to defend herself during, and before, the probable cause hearing.

49. Plaintiff was detained in Parthenon Pavilion for approximately eleven days, which caused her health to deteriorate and prohibited her from possessing the liberties necessary to adequately fulfill her daily needs.

50. During her detention, Plaintiff continually complained of sleep deprivation due to the constant interruptions by the Parthenon Pavilion staff. Her requests for peace and rest were at times recorded as attention seeking and were speculated to be part of a mental illness.

The only issue presented in this appeal is whether the trial court correctly found that Ms. Abeyta's claims are medical malpractice claims, which are subject to the provisions of Tennessee Code Annotated Section 29-26-122. Ms. Abeyta does not dispute the fact that she did not file a certificate of good faith; consequently, if the claims asserted in the amended complaint do, in fact, sound only in medical malpractice, then the trial court correctly dismissed the case. However, Ms. Abeyta argues that the amended complaint contains claims that do not sound in medical malpractice. Specifically, she contends that the amended complaint supports claims of: (1) negligence *per se*; (2) medical battery; (3) invasion of privacy; (4) false imprisonment; and (5) violation of the Americans with Disabilities Act, 42 U.S.C.A. §12101 *et seq.* ("ADA"). We will address each of these causes of action to determine whether Ms. Abeyta has stated any valid claim, sounding outside the bounds of medical malpractice, so as to survive the motion to dismiss.

### Medical Malpractice: Generally

The trial court dismissed all of Ms. Abeyta's claims for failure to file a certificate of good faith, which is required in all medical malpractice actions. Tennessee Code Annotated

Section 29-26-122 provides that: "[i]f the certificate of good faith is not filed with the complaint, the complaint shall be dismissed . . . absent a showing that the failure was due to the failure of the provider to timely provide copies of the claimant's records requested ... or demonstrated extraordinary cause." In the very recent case of **Myers v. AMISUB (SFH), Inc.**, --- S.W.3d ----, No. W2010-00837-SC-R11-CV, 2012 WL 4712152 (Tenn. Oct. 4, 2012), our Supreme Court held that the certificate of good faith requirement is mandatory, not directory, and therefore, strict rather than substantial compliance is required. *Id*. at *6– *7. In the instant case, there is no dispute that Ms. Abeyta failed to make any filing that could possibly be construed as a certificate of good faith. Moreover, Ms. Abeyta did not argue, nor do we find anything in the record that would support a finding that there were extraordinary circumstances in this case to excuse her failure to comply with the certificate of good faith requirement. It is well settled that issues not raised at the trial level are considered waived on appeal. **Waters v. Farr**, 291 S.W.3d 873, 918 (Tenn. 2009) (stating that issues not raised in the trial court are waived on appeal); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Accordingly all of Ms. Abeyta's claims that sound in medical malpractice were properly dismissed by the trial court. Ms. Abeyta argues, however, that the trial court erred in classifying her claims as sounding in medical malpractice. Instead, Ms. Abeyta argues that ordinary negligence principles apply.

Generally speaking, the elements of common law negligence include "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." **Giggers v. Memphis Hous. Auth.**, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting **McCall v. Wilder**, 913 S.W.2d 150, 153 (Tenn. 1995)).

Generally stated, a medical malpractice action is an action for damages for personal injury or death as a result of any medical malpractice by a health care provider, whether based upon tort or contract law. **Peete v. Shelby County Health Care Corp.**, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996), *perm. app. denied* (Tenn. Jan. 6, 1997). Medical malpractice claims are governed by the TMMA. In order to prevail on a claim of medical malpractice, a plaintiff must establish the following statutory elements: (1) the recognized standard of professional care in the specialty and locality in which the defendant practices; (2) that the defendant failed to act in accordance with the applicable standard of care; and (3) that as proximate result of the defendant's negligent act or omission, the claimant suffered an injury which otherwise would not have occurred. Tenn. Code Ann. § 29–26–115(a). In medical malpractice cases, the negligence of the defendant physician usually must be proved by expert testimony. **Chambliss v. Stohler**, 124 S.W.3d 116, 119 (Tenn. Ct. App. 2003). The rationale behind the expert testimony requirement stems from the complicated and technical

information presented in TMMA cases, much of which is "beyond the general knowledge of a lay jury." *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 92 (Tenn. 1999). "Unless the negligence is obvious and readily understandable by an average layperson, expert testimony will be required to demonstrate the applicable standard of care and breach of that standard." *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 892 n. 2 (Tenn. 2010). Alternatively, no expert testimony is required in order to litigate an ordinary negligence claim. *Estate of French*, 333 S.W.3d at 555.

Because medical malpractice is a category of negligence, the distinction between medical malpractice and ordinary negligence claims is subtle. There is no rigid analytical line separating the two causes of action. *Estate of French*, 333 S.W.3d at 555. The Tennessee Supreme Court has stated that the distinguishing feature between ordinary negligence and medical malpractice cases is whether a plaintiff's claim is for injuries resulting from negligent medical treatment. *Id.* Agreeing with a New York standard, the *Estate of French* Court stated:

> [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Id.*[4]

However, not all cases involving health or medical care automatically qualify as medical malpractice claims. *Id*. at 556. The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons, or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact. *Id*. In other words, in medical malpractice cases, courts look to whether the decision, act, or omission complained of required the assessment of a patient's medical condition and whether the decision, act, or omission required a decision based upon

---

[4] In *Estate of French*, the court found that a claim that the plan of treatment for the decedent fell short of the defendant's duty of care to its patient, thereby causing her injuries, was subject to the requirements of the TMMA. *Id*. at 559. In contrast, allegations that the defendant's employees failed to comply with the care plan's instructions due to a lack of training, understaffing or other causes, constituted claims of ordinary common law negligence. *Estate of French*, 333 S.W.3d at 556.

medical science, specialized training or skill. *See Holt ex rel. Waller v. City of Memphis*, No. W2000–00913–COA–R3–CV, 2001 WL 846081, at *6 (Tenn. Ct. App. July 20, 2001). Where causes of action involve complaints about acts or omissions involving medical science and expertise, they fall within the scope of the TMMA; where they do not involve such training and knowledge, they generally sound in ordinary negligence. *See generally Peete* , 938 S.W.2d at 693. Pleas or counts contained in a complaint will be given the effect required by their content, without regard to the name given them by the pleader. ***State By and Through Canale ex rel. Hall v. Minimum Salary Dept. of African Methodist Episcopal Church, Inc.***, 477 S.W.2d 11 (Tenn. 1972). The characterization of the claim impacts the means and procedures by which it must be litigated. ***Estate of French*** v. ***Stratford House***, 333 S.W.3d 546, 555 (Tenn. 2011). Therefore, it is important that this Court correctly categorize the nature of the Appellant's complaint so that the proper evidentiary requirements will be applied in the case. We now turn to the amended complaint to examine the causes of action asserted therein in light of the foregoing principles.

### ADA Claim

We begin with Ms. Abeyta's claim for violation of the ADA. In her amended complaint, Ms. Abeyta asserts that Parthenon discriminated against her and, specifically, violated the ADA by: (1) confining her against her will; (2) creating a medical record that includes documentation of her psychiatric diagnoses and treatment; (3) removing her clothing in a seclusion room without determination of clinical necessity; (4) "injecting a drug" without determination of clinical necessity; (5) rejecting her "request for reasonable accommodations for rest;" (6) administering psychiatric drugs; (7) placing her in a seclusion room, "surrounded by staff;" (8) preventing a "friend" from meeting with her; (9) failing to provide her with sufficient accommodations by placing her in a seclusion room; (10) failing to provide her equal access to food by restricting meal times; and (11) setting up "barriers. . .to any adequate means to get away from major sources of stress." Elsewhere in the complaint, Ms. Abeyta states that Parthenon is a "place of public accommodation." The ADA, at 42 U.S.C.A. §12182, provides that:

> No individual shall be discriminated against **on the basis of disability** in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

*Id*. (emphasis added).

As discussed in 26 Am. Jur. Trials § 97 (1979), which addresses representation of a

-10-

mentally ill client in a civil commitment proceeding:

> Undue institutionalization of persons with mental disabilities qualifies as "discrimination" by reason of disability under public services portion of ADA. Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132. **Olmstead v. L.C. ex rel. Zimring**, 119 S. Ct. 2176 (U.S. 1999). . . .
>
> For purpose of ADA and Rehabilitation Act, a program may discriminate on the basis of mental illness if it treats mentally ill individuals in a particular set of circumstances differently than it treats non-mentally ill individuals in the same circumstances. Rehabilitation Act of 1973, § 504, as amended, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132. **Hargrave v. Vermont**, 340 F.3d 27, 14 A.D. Cas. (BNA) 1429 (2d Cir. 2003). . . .

*Id*.

As stated in the factual averments in support of this claim, *supra*, Ms. Abeyta does not allege discrimination on the part of Parthenon. Specifically, Ms. Abeyta does not claim that she was denied treatment, or that she was treated differently because of any disability; rather, she avers that the treatment she received was somehow flawed or unnecessary. The averments contained in the amended complaint simply do not support the threshold requirements for a violation of the ADA claim, namely, that she was treated differently than other non-mentally ill patients, or even that she was treated differently than other mentally ill patients. Accordingly, the trial court did not err in dismissing this cause of action.

### Medical Battery Claim

In her third cause of action, which she titles "Medical Battery," Ms. Abeyta states:

> 67. Plaintiff was made aware that Defendants, and/or their employees or representative, prescribed medications for Plaintiff's medical treatment and intended Plaintiff to consume, or otherwise ingest these medications.
> 68. When Plaintiff was told that Defendants, and/or their employees or representatives, wanted to inject Plaintiff with medication, or otherwise force Plaintiff to consume medications, including psychotropic drugs, Plaintiff refused the treatment.
> 69. Despite Plaintiff's proper refusal to the consumption of

-11-

these medications, Defendants forcibly injected Plaintiff with medication, or otherwise forced Plaintiff to consume these medications, including psychotropic drugs.

70. As a direct and proximate result of the medical battery and forced drugging caused by Defendants, Plaintiff has suffered damages, including pain and suffering, stress and mental anguish, and loss of enjoyment of life.

The trial court determined that this cause of action sounded in medical malpractice and was subject to the TMMA. In Tennessee, medical battery is a very narrow area of the law. A medical battery typically occurs when "(1) a professional performs a procedure that the patient was unaware the doctor was going to perform; or (2) the procedure was performed in a part of the body other than that part explained to the patient (i.e., amputation of the wrong leg)." ***Ashe v. Radiation Oncology Assoc.***, 9 S.W.3d 119, 121 (Tenn. 1999). This Court has set forth a "simple inquiry" to determine whether a case constitutes a medical battery:

> (1) was the patient aware that the doctor was going to perform the procedure (i.e., did the patient know that the dentist was going to perform a root canal on a specified tooth or that the doctor was going to perform surgery on the specified knee?); and, if so (2) did the patient authorize performance of the procedure? A plaintiff's cause of action may be classified as a medical battery only when answers to either of the above questions are in the negative."

***Blanchard v. Kellum***, 975 S.W.2d 522, 524 (Tenn. 1998). Taking the above allegations as true, Ms. Abeyta's complaint alleges that she (1) was aware that Parthenon, and/or its staff, were going to inject her with medications; and (2) did not authorize that treatment. The facts alleged by Ms. Abeyta with regard to her medical battery case are similar to the recent case of ***Hinkle v. Kindred Hospital***, No. M2010-02499-COA-R3-CV, 2012 WL 3799215 (Tenn. Ct. App. Aug. 31, 2012). In ***Hinkle***, this Court denied summary judgment to the defendant hospital on a medical battery claim when the plaintiff alleged that the staff of the hospital administered treatment despite the patient's refusal to submit to the treatment. ***Id.*** at *17. Likewise in this case, Ms. Abeyta asserts that staff at Parthenon administered medications to her despite her refusal to consent. Therefore, Ms. Abeyta has made out a claim for medical battery. A claim for medical battery is not a medical malpractice claim governed by the TMMA. As discussed in ***Hinkle***:

In the recent of case ***Barnett v. Elite Sports Medicine***, M2010-

> 00619-COA-R3-CV, 2010 WL 5289669 (Tenn. Ct. App. Dec. 17, 2010) (no Tenn. R. App. P. 11 app. filed), this court was faced with the question whether the filing of a certificate of good faith applies to a claim for medical battery. We noted that Tenn. Code Ann. § 29-26-122(a) states that the certificate is required "[i]n any medical malpractice action in which expert testimony is required by § 29-26-115." Since expert testimony is not required to sustain a claim for medical battery, we concluded that the certificate need not be filed to support such claims. *Barnett v. Elite Sports Medicine*, 2010 WL 5289669 at *5.

*Hinkle*, 2012 WL 3799215, at n.11. Consequently, the trial court erred in dismissing Ms. Abeyta's claim for medical battery for failure to comply with the TMMA.

## Negligence Per Se

In her second cause of action, Ms. Abeyta claims that Parthenon, or its employees, committed negligence per se in violating the statutory guidelines for emergency involuntary admission to inpatient treatment, Tennessee Code Annotated Section 33-6-401 *et seq*. This Court has explained the doctrine of negligence per se as follows:

> The standard of conduct expected of a reasonable person may be prescribed in a statute and, consequently, a violation of the statute may be deemed to be negligence per se. When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard of care ... from which it is negligence to deviate. In order to establish negligence per se, it must be shown that the statute violated was designed to impose a duty or prohibit an act for the benefit of a person or the public. It must also be established that the injured party was within the class of persons that the statute was meant to protect.

*Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994) (citations omitted). A claim of negligence per se requires a plaintiff to prove that the defendant: (1) violated a statute, ordinance, or regulation that requires or prohibits a particular act for the benefit of the plaintiff or the general public; (2) that the injured person was within the class of individuals the legislature intended to benefit and protect by enacting the statute, ordinance, or regulation; and (3) that the defendant's negligence was the

-13-

proximate cause of the injured party's injury. **Smith v. Owen**, 841 S.W.2d 828, 831 (Tenn. Ct. App.1992); **Holt ex rel. Waller**, 2001 WL 846081 at \*5. The negligence per se doctrine applies not only to violations of statutes, but also to violations of regulations and ordinances so long as the statute/regulation/ordinance was designed to impose a duty or prohibit an act for the benefit of a person or the public and the injured party was within the class of individuals the statute was meant to protect. **Estate of French**, 333 S.W.3d at 560–61.

Accordingly, while both medical malpractice and negligence per se require proof of a standard of care applicable to the defendant, like ordinary negligence and medical malpractice (discussed above), they differ as to how that standard is to be established. It is that difference that is the basis for the Tennessee Supreme Court's holding in **Estate of French** that a medical malpractice claim cannot be based on negligence per se. The **Estate of French** Court explained that declaring conduct negligent per se means that the conduct is negligent as a matter of law, thus relieving plaintiffs from having to prove the standard of care from which the defendant allegedly deviated. **Id**. at 561. The Court reasoned that relying on federal and state regulations to prove a standard of care where medical malpractice is alleged would be inconsistent with the TMMA's requirement that the plaintiff prove the defendant violated "[t]he recognized standard of acceptable professional practice in the profession . . . that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred." **Id**.; Tenn. Code Ann. § 29-26-115(a)(1).

> In order to prove a violation of the TMMA, a plaintiff must show that his or her injuries resulted because the defendant failed to act with ordinary and reasonable care when compared to the customs or practices of physicians from a particular geographic region. In consequence, the locality rule, which the legislature intended to apply to private causes of action for medical malpractice, precludes plaintiffs from proceeding on a negligence per se theory based upon alleged violations of nursing home regulations.

**Estate of French**, 333 S.W.3d at 562 (quoting **Sutphin v. Platt**, 720 S.W.2d 455, 457 (Tenn.1986); **Conley v. Life Care Ctrs. of Am.**, 236 S.W.3d 713, 734 (Tenn. Ct. App. 2007)). Consequently, the **Estate of French** Court held that a plaintiff cannot use a violation of federal or state regulations to prove a deviation from the standard of care as a component of a medical malpractice claim. **Estate of French**, 333. S. W.3d at 561. However, according to **Estate of French**, a violation of a federal or state regulation may be the basis for a negligence per se claim, which is not governed by the TMMA.

One of the initial questions in a negligence per se claim is whether the statute or regulation at issue actually prescribes the standard of conduct. In *King v. Danek Medical, Inc.*, 37 S.W.3d 429 (Tenn. Ct. App. 2000), which involved allegations of negligence per se against the manufacturer of pedicle screw devices based on its conduct in marketing the device for a use that had not been approved by the FDA in violation of FDA regulatory restraints., *Id*. at 455–56, this Court discussed the type of statute or regulation that can form the basis for a claim of negligence per se:

> When alleging a statute or regulation based negligence per se claim, it is not sufficient for a plaintiff to assume . . . that the alleged violation of a statute automatically supports a claim of negligence per se. Even if the plaintiffs are within the class to be protected by the statute, . . . a statutory negligence per se claim cannot stand unless the statute establishes a standard of care.

*Id*. at 460. The *King* Court quoted a federal decision discussing when a regulation is not a standard of care, but merely an administrative requirement:

> When a statutory provision does not define a standard of care but merely imposes an administrative requirement, such as the requirement to obtain a license or to file a report to support a regulatory scheme, violation of such requirement will not support a negligence per se claim. Even if the regulatory scheme as a whole is designed to protect the public or to promote safety, the licensing duty itself is not a standard of care, but an administrative requirement.

*Id*. In *King*, the Court held that the requirement that a device be "approved by the FDA before being marketed—as opposed to a specific substantive requirement that a device be safe and effective—is only a tool to facilitate administration of the underlying regulatory scheme." *Id*. at 457 (quoting *Talley v. Danek Medical, Inc*., 179 F.3d 154, 161 (4th Cir. 1999)). Concluding that the regulatory requirement "lacks any independent substantive content," the Court held that "it does not impose a standard of care." *Id*. The court analogized the regulatory infraction to the failure to have a driver's license. *Id*. It observed that Tennessee cases involving a statutory or regulatory basis for a negligence per se claim "apply statutes with substantive context, rather than . . . only administrative requirements." *Id*. at 458 (citing *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994)). Because the *King* Court found the regulation at issue to be only an administrative requirement, it did not address the issue of whether the plaintiff was within the protection of the statute or intended to be benefitted by it. Thus, the dismissal of the plaintiff's negligence claim was

affirmed. *Id*.

In the instant case, Ms. Abeyta asserts her claim for negligence per se on grounds that Parthenon, or its employees, violated the statutory guidelines for emergency involuntary admission to inpatient treatment, Tennessee Code Annotated Section 33-6-401 *et seq*. This Court has previously addressed the question of whether the involuntary commitment statutes prescribe only administrative requirements (which would make them exempt from negligence per se claims), or whether the statutes define the standard of care (so as to be subject to negligence per se claims). In *Vickroy v. Pathways, Inc.*, No. W2003-02620-COA-R3-CV, 2004 WL 3048972 (Tenn. Ct. App. Dec. 30, 2004), Pamela Vickroy, who had been diagnosed with bipolar disorder, sued Dr. James Forest-Lam for involuntarily committing her to a mental institution without personally examining her. The trial court granted the physician summary judgment, finding that Ms. Vickroy had failed to offer adequate expert proof as required under the TMMA, Tennessee Code Annotated Section 29-26-115. Like the case at bar, in *Vickroy*, the involuntary commitment statutes were at issue, specifically Tennessee Code Annotated Section 33-6-404, which states:

> IF
> (1)(A) a licensed physician, psychologist, or designated professional takes a person into custody under Section 33-6-402;
> OR
> (B) a person is brought to such a physician, psychologist, or designated professional for examination under this section,
> THEN
> (2) the physician, psychologist, or designated professional shall immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource under Section 33-6-403, AND
> (3)(A) IF
> (i) the person is not subject to admission, THEN
> (ii) the physician, psychologist, or designated professional shall release the person, AND
> (B) IF (I) the person is subject to admission, THEN (ii) the physician, psychologist, or designated professional shall complete a certificate of need for such emergency diagnosis, evaluation, and treatment showing the factual foundation for the conclusions on each item of Section 33-6-403, AND (iii) the physician, psychologist, or designated professional shall assess the person's clinical needs and need for physical restraint or vehicle security and determine the mode of transportation to the

hospital in consultation with the mandatory pre-screening agent, other mental health professional familiar with the person, or a knowledgeable family member.

The ***Vickroy*** Court held that this statute requires a medical professional, who involuntarily commits a patient to a mental institution, to have first personally examined the patient before signing the certificate of need. ***Id***. at *8.  In ***Vickroy,*** the defendant physician signed the certificate of need to commit the plaintiff, relying on a physical examination performed earlier by another physician who had since gone off duty. ***Id***. at * 1–2. The plaintiff's claims included a claim of negligence per se based on the physician's failure to personally examine her before signing the certificate. The court rejected the plaintiff's claim of medical malpractice on the basis that the plaintiff had not produced expert testimony on the issue of causation. ***Id***. at *8. The ***Vickroy*** court found, however, that, apart from medical malpractice, the statute established the standard of conduct for a claim of negligence per se based on a violation of Tennessee Code Annotated Section 33-6-404.[5]  The defendant in ***Vickroy*** did not expressly argue that the statute was merely an "administrative" requirement; rather, he argued that it did not create a duty on his part to personally examine the plaintiff, only to make certain that a medical professional had examined her before he signed the certificate of need for her commitment. ***Id***. at *6. This argument was rejected. The ***Vickroy*** Court looked at other statutes on commitment, as well as the statute at issue, and concluded that the "legislative expectation was that the involuntary commitment of a patient must be done by a professional who has examined the patient, and not based on the statements and observations of others." ***Id***. Thus, the Court found that the legislature had, by enacting the statute, established this as a standard of conduct for a medical professional in involuntary commitments:

> In her complaint, Vickroy recounts the events of February 4, 2001. She asserts that Dr. Forest-Lam falsely certified in the certificate of need that he had personally examined Vickroy, and that he made no personal judgment about her condition before causing her to be involuntarily transported to Western without proper cause. She alleges that Dr. Forest-Lam's actions "were negligent and caused serious emotional distress and unlawful

---

[5] In ***Vickroy***, some of the plaintiff's claims were deemed not to be medical malpractice because the certificate of need to commit a patient could be signed by a "designated professional" who was not a physician, and the plaintiff claimed damages not arising out of the defendant physician's medical judgment. ***Vickroy***, 2004 WL 3048972, at *10-11. In dicta, however, the ***Vickroy*** court observed that it was unlikely that the standard of care would permit a physician to commit a patient without a personal examination, in light of the statute. ***Id***. at *8 n.10.

restraint on the liberty of" Vickroy. Vickroy sought compensatory and punitive damages for her "physical and emotional distress" and the deprivation of her liberty.

To the extent that Vickroy's claim is based on a theory of medical malpractice, it must fail based on the inadequacy of Dr. Menkes' affidavit. . . .

\*                                    \*                                    \*

However, Vickory's cause of action against Dr. Forest-Lam is not limited to claims arising out of alleged medical malpractice. As stated above, in the September 30, 2003 hearing on the motions for summary judgment, Vickroy argued that Section 33-6-404 establishes the standard of care and no expert proof is needed to prove that Dr. Forest-Lam did not meet this standard. We agree with the general reasoning of this statement but clarify that the statute establishes a standard of conduct for any person qualified to sign a certificate of need for involuntary commitment. "The standard of conduct expected of a reasonable person may be prescribed in a statute and, consequently, a violation of the statute may be deemed to be negligence per se." *Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994) In a negligence per se action, the plaintiff must show that the "statute violated was designed to impose a duty or prohibit an act for the benefit of the public. (citations omitted) It must also be established that the injured party was within the class of persons that the statute was meant to protect." *Id*. at 937. Vickroy argues that her damages arise from Dr. Forest-Lam's violation of the commitment statute. Thus, in essence, Vickroy states a claim of negligence per se.

*Vickroy*, 2004 WL 3048972 at \*8.

Although the averments made by Ms. Abeyta in support of her negligence per se claim are not exactly the same as those made by the plaintiff in *Vickroy*, we nonetheless conclude that the *Vickroy* holding that the involuntary commitment statute establishes the applicable standard or care, without the need of medical expertise, is controlling in this appeal.

-18-

In her amended complaint, Ms. Abeyta claims, in relevant part, that, when she arrived at Parthenon: (1) the examining physician did not record her explanations and health history, but simply recorded "that the patient had reported a history of seizures[;]" (2) the emergency room doctor performed only "baseline tests, thus only being able to see that moment in time and with the influence of surrounding doubts;" (3) the emergency room doctor based his opinion that "Plaintiff suffers from delusions about her medical conditions" on "unproven comments that were communicated by the strangers who were on the mobile crises team," and (inferentially) not upon his own examination and expertise; (4) Parthenon employees forced her to wait without food or water; (7) Parthenon employees shifted the burden to Ms. Abeyta "to assert the truth of her health conditions," rather than taking actions "to confirm the reality of her health condition." Based, in part, upon these allegations, Ms. Abeyta avers, at Paragraph fifty-nine of the amended complaint, that Parthenon, and its staff, "owed [Ms. Abeyta], as well as all individuals, a statutory duty of care as described and set out in the statutes governing the involuntary admission of patients for treatment." These allegations go specifically to the question of whether the treating physician(s) followed the requirements and standards contained in the involuntary commitment statutes, namely proper examination of the patient prior to commitment. Although Ms. Abeyta does not aver that she was not examined by the committing physician, this distinction from the *Vickroy* case is not dispositive. The foregoing facts, if taken as true and viewed in a light most favorable to Ms. Abeyta as the non-moving party, support, at this stage, a claim for negligence per se for violation of Tennessee Code Annotated Section 33-6-404(2), which requires that "the physician, psychologist, or designated professional shall immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource under Section 33-6-403." The averments set out above, if taken as true, indicate that the admitting staff at Parthenon did not properly examine Ms. Abeyta; rather, she avers that the examination was not thorough, and was not based on the physician's own diagnosis, but was instead based upon statements made by "unproven comments of strangers. . . ."

In addition, Tennessee Code Annotated Section 33-6-403 describes the circumstances under which a patient may be involuntarily committed to treatment:

> IF AND ONLY IF
> (1) a person has a mental illness or serious emotional disturbance, AND
> (2) the person poses an immediate substantial likelihood of serious harm, under § 33-6-501,[6] because of the mental illness

_____

[6] Tennessee Code Annotated Section 33-6-501 provides:

(continued...)

or serious emotional disturbance, AND
(3) the person needs care, training, or treatment because of the mental illness or serious emotional disturbance, AND
(4) all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person,
THEN
(5) the person may be admitted and detained by a hospital or treatment resource for emergency diagnosis, evaluation, and treatment under this part.

At paragraph twenty-four of the amended complaint, Ms. Abeyta states that, when she was brought to Parthenon, she "was not violent or acting as a threat to herself or others," and that she "did not display or state any suicidal or homicidal ideation at any time prior to, or while being held at Parthenon Pavilion." Taking these allegations as true, Ms. Abeyta is ostensibly arguing that at least one of the criteria for involuntary admission, namely that the person "poses an immediate substantial likelihood of serious harm. . . . ," was not satisfied so as to justify her involuntary admission. If we take as true the averment that Ms. Abeyta was not a threat to herself or other, which we must do at the motion to dismiss stage, then her condition did not satisfy a mandatory criterion for involuntary commitment.

Furthermore, Ms. Abeyta avers that:

---

[6](...continued)
IF AND ONLY IF

(1)(A) a person has threatened or attempted suicide or to inflict serious bodily harm on the person, OR
(B) the person has threatened or attempted homicide or other violent behavior, OR
(C) the person has placed others in reasonable fear of violent behavior and serious physical harm to them, OR
(D) the person is unable to avoid severe impairment or injury from specific risks, AND
(2) there is a substantial likelihood that the harm will occur unless the person is placed under involuntary treatment,

THEN

(3) the person poses a "substantial likelihood of serious harm" for purposes of this title.

60. T.C.A. §33-6-415 provides, in part, that "Pending the probable cause hearing under §33-6-422, no treatment shall be given that will make the defendant unable to consult with counsel or to prepare a defense in proceedings for involuntary care and treatment.

61. Defendants violated §33-6-415 by injecting Plaintiff with psychotropic drugs, including Haldol, without Plaintiff's consent, prior to her probabl[e] cause hearing.

62. The forced treatment of Plaintiff with these drugs affected Plaintiff's mental faculties adversely and prohibited Plaintiff from properly preparing a defense in her proceedings, which is in violation of the statute.

Although, as discussed above, the question of whether and what types of medication were administered would require expert medical testimony, in the negligence per se claim, we are concerned with the timing of the administration of the medication and not with whether the medication was medically necessary or counterindicated. This is a subtle, but important, distinction. As pointed out by Ms. Abeyta, Tennessee Code Annotated Section 33-6-415 provides:

Pending the probable cause hearing under § 33-6-422, no treatment shall be given that will make the defendant unable to consult with counsel or to prepare a defense in proceedings for involuntary care and treatment. No psychosurgery, convulsive treatments, or insulin treatment shall be undertaken for any psychiatric disorder until an order has been entered, after the § 33-6-422 probable cause hearing in accordance with the provisions of this part, requiring continued involuntary care and treatment of the defendant.

In her amended complaint, Ms. Abeyta states that a probable cause hearing was held "on or about June 15, 2007;" however, she indicates that psychotropic medications were administered prior to the probable cause hearing, beginning on June 11, 2007:

On the evening of June 11, 2007, and thus before a probable cause hearing was conducted, the Plaintiff was prescribed Haldol, Depakote and Abilify.

Not only does Ms. Abeyta aver that these medications were counterindicated (a question of medical treatment), but, as is important to the negligence per se claim, she states that the

-21-

medication made her unable to "properly prepar[e] a defense in her proceedings, which is in violation of the statute." Taking the allegations in the complaint as true, Ms. Abeyta has stated a claim for negligence per se based upon the **timing** of the administration of the drugs and the stated fact that the medication caused her to be unable to participate in her defense. Unlike the question of whether the drugs were medically necessary, the questions of timing and effect of the drugs on her ability to defend herself are not questions outside the knowledge of the average lay person. Thus, if the drugs were administered prior to the probable cause hearing (as Ms. Abeyta asserts), and if those medications cause Ms. Abeyta a disadvantage in objecting to the involuntary commitment and/or in preparing for the probable cause hearing (which she also asserts), then she has made out a claim for negligence per se for violation of Section 33-6-415.

Finally, Ms. Abeyta states:

> 63. T.C.A. §33-6-416 provides, in part, that "If the court orders the admission of the defendant for diagnosis, evaluation and treatment under §33-6-413, the chief officer shall give notice of the order to the defendant. . . . The notice shall state specifically the basis for the defendant's detention and the standards for possible future commitment. The notice shall also inform the defendant of the defendant's right to counsel during the course of proceedings for involuntary care and treatment."
> 64. Defendants violated §33-6-416 by not giving proper notice to Plaintiff as required by statute.

In its order, the court specifically finds that "proper notice was given [to Ms. Abeyta], as she was afforded due process through a timely emergency court hearing in compliance with the statute." There is no indication that the court looked outside the pleadings in this case so as to convert the motion to dismiss to one for summary judgment. *See* Tenn. R. Civ. P. 12.02 ("If. . .matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . ."). However, we have been unable to determine the factual basis utilized by the trial court for its finding that due process was satisfied in this case. Although Ms. Abeyta's amended complaint does indicate that a probable cause hearing was held, in paragraphs sixty-three and sixty-four, *supra*, she indicates that she received no notice, or that the notice was insufficient pursuant to the statute. Again, at the motion to dismiss stage, we must take the averments as true and give inferences in favor of the non-moving party. Doing so here, we can only conclude, based on Ms. Abeyta's statements, above, that notice was not given, or, if it was, that it was flawed.

Based upon the foregoing, we conclude that the trial court erred in dismissing Ms. Abeyta's negligence per se claims.[7]

## Invasion of Privacy

Ms. Abeyta's fourth cause of action is for invasion of privacy. In the amended complaint, she specifically avers that:

> 71. The Defendants, and/or their employees or representatives, intentionally intruded upon the Plaintiff's solitude or seclusion or the private affairs or concerns of the Plaintiff.
> 72. Specifically, Defendants disrobed Plaintiff against her will in the presence of a male individual and continually invaded her privacy by entering the area in which she was housed at all hours of the night without her consent.
> 73. Additionally, the Defendants intentionally intruded upon her physically by forcibly requiring her to consume medications despite her refusal.
> 74. The Defendants' intrusions and invasions to her privacy would be highly offensive to a reasonable person.

As noted in 26 Am. Jur. Trials §133 (1979):

> A basic right that is lost almost immediately by an individual entering an institution is his [or her] right to privacy. Patients are often required to live in dormitory-like facilities where there is little or no allowance made for personal privacy. Again, although there has been surprisingly little litigation as to this

---

[7] We note that Ms. Abeyta's claims for violations of the involuntary commitment statutes were dismissed on a motion to dismiss in the trial court, and, as such, Parthenon never filed an answer or asserted any defenses. While we hold that violations of the involuntary commitment statute as alleged by Ms. Abeyta constitute negligence per se, this holding does not preclude Parthenon from asserting or establishing any applicable defenses on remand. We note the existence of Tennessee Code Annotated Section 33-9-901(d), which states that:

> All persons acting in good faith, reasonably and without negligence in connection with the preparation of petitions, applications, certificates or other documents or the apprehension, detention, discharge, examination, transportation or treatment of a person under this title shall be free from all liability, civil or criminal, by reason of the acts.

basic right, a few courts have held that mental patients do have a right to privacy taking into consideration the needs of their treatment program. . . .

*Id*. (footnote omitted). Some states have passed legislation to ensure a mental patient's right to privacy. *Id*.

Tennessee Code Annotated Section 33-3-102 provides:

a) No person with mental illness, serious emotional disturbance, or developmental disability hospitalized or admitted, whether voluntarily or involuntarily, or ordered to participate in nonresidential treatment or service under this title, shall, solely by reason of the hospitalization, admission, or order, be denied the right to dispose of property, execute instruments, make purchases, enter into contractual relationships, **give informed consent to treatment**, and vote, unless;
(1) The service recipient has been adjudicated incompetent by a court of competent jurisdiction and has not been restored to legal capacity; or
(2) The denial is authorized by state or federal statute.
(b) No person shall make decisions for a service recipient on the basis of a claim to be the service recipient's conservator, legal guardian, guardian ad litem, caregiver under title 34, chapter 6, part 3, or to be acting under a durable power of attorney for health care under title 34, chapter 6, part 2, until the person has presented written evidence of the person's status.

*Id*. (Emphasis added). In addition, the Tennessee Constitution, Article I, Section 8 provides: "That no [person] shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." To date, Tennessee courts have not had the opportunity to discuss either Tennessee Code Annotated Section 33-3-102, or our constitutional guaranties, in the context of alleged invasions of privacy in involuntary commitment cases. Accordingly, we find guidance in cases decided by our sister states.

"The law recognizes the right of an individual to make decisions about her life out of respect for the dignity and autonomy of the individual, that interest is no less significant when the individual is mentally . . . ill." *In re Mental Health of K.K.B.*, 609 P.2d 747, 752

-24-

(Okla. 1980). The right to be free from bodily intrusions is so fundamental that, when there is a decision about whether to comply with medical treatment, it is the individual who must make that decision in order to protect his or her right to privacy. *Rivers v. Katz*, 495 N.E.2d 337, 341 (N.Y. 1986) (citing *Erickson v. Dilgard*, 44 Misc. 2d 27, 28 (N.Y. Sup. Ct. 1962)). It is well settled that it is a constitutional invasion to treat medically a competent person without consent, unless there is an emergency present. *See Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."). Logically, this principle is true of mental patients as well. Roederick C. White, Sr., *What Right to Privacy? The Risk to the Voluntary Mental Health Patient as a Result of Louisiana's Current Forcible Medication Statute*, 24 S.U. L. Rev. 1, 8 (1996). And, while in the past the decision of commitment may have been synonymous with a patient's incompetency, it is almost unanimously accepted now by both medical and legal professionals that there is no significant relationship between the need for commitment of a mentally ill patient and the patient's ability to make treatment decisions. *Rivers*, 495 N.E.2d at 342 (exploring the relationship between involuntary commitment and a finding of incompetency); *see also Riese v. St. Mary's Hosp. & Med. Ctr.*, 271 Cal. Rptr. 199, 206 (Ct. App. 1987); *In re Conticchio*, 696 N.Y.S.2d 769, 773 (N.Y. Sup. Ct. 1999); *see also Washington v. Harper*, 494 U.S. 210, 222-23 (1990) (discussing a Tenth Circuit panel's determination that, under the balance formulated by the Court in Washington, a finding of incompetency of the mentally ill patient was needed for forced treatment)).

A legal determination of a patient's competency bears upon the state's ability to invoke its *parens patriae* power to medicate patients forcibly. *In re Conticchio*, 696 N.Y.S.2d at 773 (determining when the state's *parens patriae* power can be used as a compelling interest of the state to override the patient's liberty interest). The *parens patriae* doctrine conflicts with the patient's liberty interest in refusing treatment by allowing the state to administer treatment without consent. Mary C. McCarron, *The Right to Refuse Antipsychotic Drugs: Safeguarding the Mentally Incompetent Patient's Right to Procedural Due Process*, 73 Marq. L. Rev. 477, 489–91 (1990) (discussing the origins and limits of the *parens patriae* power of the state). The prerequisite to the use of such power by the state, however, is a judicial determination that a patient lacks the capacity to make treatment decisions. *In re Conticchio*, 696 N.Y.S.2d at 773. Once the state has obtained a judicial finding of the patient's incompetency, it can provide treatment over the patient's objections by relying on the state's *parens patriae* power to act in its citizens' best interest. *See* William M. Brooks, *Reevaluating Substantive Due Process as a Source of Protection for Psychiatric Patients to Refuse Drugs*, 31 Ind. L. Rev. 937, 1000–01 & n. 435 (1998) (discussing the Supreme Court's consideration of cases concerning the right to refuse medication in two other contexts: medicating a prisoner and medicating a criminal defendant to induce competency).

The only interest that should override a patient's decision to refuse treatment, when there has been no judicial finding of incompetency, is the need to medicate an involuntarily committed mental patient in an emergency situation. Chris R. Hogle, *Woodland v. Angus: The Right to Refuse Antipsychotic Drugs and Safeguards Appropriate for Its Protection*, 1994 Utah L. Rev. 1169, 1179–80 (stating that most courts are more inclined to leave discretion to medical professionals in emergency situations). If the patient presents a danger to herself or others or engages in destructive behavior in the institution, the state may administer antipsychotic medication over the patient's objections. *Rivers*, 495 N.E.2d at 343 (citing ***Addington v. Texas***, 441 U.S. 418, 426 (1979); ***Davis v. Hubbard***, 506 F. Supp. 915, 934-35 (N.D. Ohio 1980); ***Colorado v. Medina***, 705 P.2d 961, 971 (Colo. 1985); ***Gundy v. Pauley***, 619 S.W.2d 730, 731 (Ky. Ct. App. 1981); and ***In re Mental Health of K.K.B.***, 609 P.2d 747, 751 (Okla. 1980)). "In situations where the patient 'poses an imminent threat of harm to himself or others,' and [where] there is no less intrusive alternative [to the forcible medication of the patient], . . . the State may [legitimately] invoke its police . . . power[]" to prevent possible harm. ***In re Guardianship of Linda***, 519 N.E.2d 1296, 1299 (Mass. 1988) (citation omitted).

It is important to note that, even if the initial commitment of the patient was based on the exercise of the state's police power in an emergency situation, that commitment decision does not justify forcible medication of the patient. *See **Hogle***, *supra*, at 1179. To override a patient's right to refuse medication, the emergency must be a legitimate one that has arisen within the institution. ***Id***. Forced medication has been deemed acceptable in such situations only when the need to eliminate the danger has been found to outweigh the possible harm to the medicated patient and all other reasonable alternatives have been ruled out. *See **Rogers v. Okin***, 634 F.2d 650, 656 (1st Cir. 1980).

Since "forced drugging abridges a patient's fundamental right to bodily autonomy, due process [should] require[] [that forced medication] be the least restrictive means of satisfying the state interest in question." Brooks, *supra*, at 1008 (citing ***Riggins v. Nevada***, 504 U.S. 127, 135 (1992) (discussing when a state's overriding interests of controlling hospital emergencies and treating incompetent patients may justify forcing medication)). While an emergency situation may justify the invocation of the state's police power to medicate an involuntarily committed mental patient forcibly, this justification would last only as long as the emergency exists. ***Rivers***, 495 N.E.2d at 343. Without a least-restrictive-means consideration, the patient's fundamental right to refuse medication may be compromised by allowing treatment to be administered or continued when no real emergency exists. McCarron, *supra*, at 492. In order to protect the patient's right to refuse medication in situations where the state's police power may override the patient's liberty interest, it is important that the interest deemed compelling is immediate and the justification for medication last only as long as the emergency does. ***Rivers***, 495 N.E.2d at 343.

Ms. Abeyta asserts that Parthenon, or its employee, invaded her right to privacy in three ways: (1) forcing her to ingest medication; (2) coming into her room at all hours; and (3) forcing her to disrobe in front of a male person. According to the amended complaint, all of these events took place "without her consent." Taking these allegations as true, and applying the foregoing principles, we conclude that Ms. Abeyta has stated a cause of action for invasion of her privacy. Ms. Abetya clearly asserts that all of these "invasions" occurred before the probable cause hearing. Consequently, at the time of the offensive events, there was no adjudication of mental incompetence so as to preclude Ms. Abeyta's right to refuse specific treatments and to allow the state's power of *parens patriae* to operate. Moreover, Ms. Abeyta clearly avers that she was not a danger to herself or others at the time the alleged invasions of privacy occurred. Thus, she claims that there was no emergency situation requiring administration of drugs, or other actions (i.e., making her disrobe, or interrupting her sleep). Taking these statements as true, at the motion to dismiss stage, no factual basis exists to countenance Parthenon's actions in medicating or treating Ms. Abeyta against her will.

In *Jarvis v. Levine*, 418 N.W.2d 139 (Minn. 1988), the plaintiff patient had been civilly committed to a mental hospital after shooting his sister, and, during the period of his commitment, was involuntarily treated with neuroleptic medication four times. The Minnesota Supreme Court recognized that the involuntary administration of neuroleptic drugs constituted intrusive treatment requiring procedural safeguards and held that the right to privacy under the state constitution protected the integrity of a person's body and included the right not to have it altered or invaded without consent. The court rejected the state's argument that the court should not interfere with the proposed method of treatment of a patient by a physician because people committed to mental institutions were committed for the specific purpose of receiving treatment and were therefore different from people in free society. The court declared that commitment to an institution did not deprive an individual of all legal rights, especially fundamental rights guaranteed by the state constitution, and, while acknowledging that it would be both unreasonable and unnecessary for the courts to become involved in every post-commitment treatment decision, it nevertheless determined that the courts could not abdicate all responsibility for protecting a committed person's fundamental rights simply because some degree of medical judgment was implicated. *Id*. at 147–48. The court explained that, when medical judgments collided with a patient's fundamental rights, as in the case of involuntary administration of neuroleptic drugs, it was the court, not the doctors, who possessed the necessary expertise to decide. *Id*. The Court explained that, "[u]nless extraordinary circumstances exist, a competent person has the right to refuse to accept the type of intrusive treatment recommended here." *Id*. The court stated that an institutionalized patient should have the same right as one in a free and open society to refuse to accept the intrusive treatment and further stated that, to deny mentally ill individuals the opportunity to exercise that right, was to deprive them of basic human dignity

by denying their personal autonomy. *Id*.

## False Imprisonment

In her fifth cause of action, Ms. Abeyta alleges that she was falsely imprisoned by Parthenon, or its staff. Specifically, the amended complaint states:

> 76. Defendants infringed on the personal liberty of the Plaintiff by intentionally and unlawfully restraining and confining Plaintiff against her will.
> 77. Defendants used force to restrain the Plaintiff against her will.
> 78. Defendants' intentional and unwarranted restraint of Plaintiff prevented Plaintiff from properly addressing and getting adequate care for her legitimate health concerns.
> 79. Defendants' restrained Plaintiff's personal liberties without regard to the harm that was being done to her health and welfare.

Tennessee Code Annotated Section 39-13-302 states:

> (a) A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty.

According to 8 Tennessee Practice: Tennessee Pattern Jury Instructions—Civil § 8.10, "false imprisonment is the unlawful violation of the personal liberty of another. It is an intentional and unlawful restraint, confinement, or detention that compels the person to stay or go somewhere against the person's will." In the context of mental illness, Tennessee Code Annotated Section 33-3-901 provides:

> (a) A person commits a Class E felony who:
>
> (1) Without probable cause to believe a person has developmental disability, mental illness, or serious emotional disturbance, causes or conspires with or assists a third person to cause the hospitalization or admission of the person under this title; or
> (2) Causes or conspires with or assists another to cause the denial to a person of any right accorded to a person under this

-28-

title.

(b) A person commits a Class E felony who:

(1) Without probable cause to believe a person has developmental disability, mental illness, or serious emotional disturbance executes a petition, application, or certificate under this title, or otherwise secures or attempts to secure the apprehension, detention, hospitalization, admission, or restraint of the person; or

(2) Knowingly makes any false certificate or application under this title.

(c) The commissioner or the chief officer of any hospital, developmental center, or treatment resource acting pursuant to this title shall be entitled to rely in good faith upon the representations made for admission by any person or any certification with respect to any person made by a professional authorized to provide certificates under this title or any court.

(d) All persons acting in good faith, reasonably and without negligence in connection with the preparation of petitions, applications, certificates or other documents or the apprehension, detention, discharge, examination, transportation or treatment of a person under this title shall be free from all liability, civil or criminal, by reason of the acts.

As discussed in 35 C.J.S. False Imprisonment § 23 (2012):

The detention of mentally ill persons presenting a risk of serious harm is a statutory privilege, and a physician who signs in good faith a certificate attesting to a person's need of commitment to a mental institution is immune from prosecution for false imprisonment. In particular, under statutory provisions authorizing the detention of alleged mentally ill persons without application to a court, those restraining such persons **pursuant to the terms of the statute** are not liable for false imprisonment. Thus, where a person is taken into custody **pursuant to the procedurally valid certificate** of a physician authorizing involuntary mental treatment, the resulting detention is not unlawful. However, **where a hospital or physician fail to comply with the statutory procedural safeguards**

**governing the involuntary commitment of a patient, including a hearing as prescribed by law, the commitment is not privileged even though it was allegedly on an emergency basis because of the patient's alleged suicidal state**. Compliance with state statutory provisions, however, will confer immunity from a claim of false imprisonment.

*Id*. (Emphasis added). Accordingly, the gravamen of false imprisonment within the context of involuntary commitment is whether the statutory procedure was followed, or whether the person accused of false imprisonment acted in good faith belief that the applicable procedure was followed. Having determined above that Ms. Abeyta may maintain her negligence per se claims in this case, a question necessarily exists as to whether the proper procedure for involuntary commitment was followed in this case. Until that question is answered, Ms. Abeyta may maintain her false imprisonment claim.

For the foregoing reasons, we affirm the order of the trial court dismissing the claim for violation of the ADA. We reverse the order of the trial court dismissing the claims of medical battery, negligence per se, invasion of privacy, and false imprisonment. The case is remanded for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against the Appellee, HCA Health Services of Tennessee, Inc., d/b/a Parthenon Pavilion at Centennial. Execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE